UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MEDICAL BENEFITS
ADMINISTRATORS OF MD, INC., a
Maryland corporation; and
CUSTOM RAIL EMPLOYER WELFARE
TRUST FUND,

        Plaintiffs,

  v.

SIERRA RAILROAD COMPANY, n/k/a
SIERRA NORTHERN RAILWAY; VANNA
M. WALKER; AMBER A. GILLES and
DAVID N. MAGAW,

        Defendants.

NO. CIV. S-06-2408 FCD DAD

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on plaintiffs Medical Benefits Administrators of MD, Inc. ("MBA") and Custom Rail Employer Welfare Trust Fund's ("CREW") (collectively, "plaintiffs") motion for summary judgment against defendants Sierra Railroad Company ("Sierra") and Vanna M. Walker ("Walker") (collectively, "defendants") as to Count I of the First Amended Complaint ("FAC"), seeking equitable restitution pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") Section

502(a)(3) (codified at 29 U.S.C. § 1132(a)(3)).[1]  This action proceeds against Sierra and Walker solely on Count I of the FAC under ERISA; previously, the court dismissed plaintiffs' state law claims as preempted by ERISA, and it dismissed named defendants Amber Gilles ("Gilles") and David Magaw ("Magaw") since plaintiffs asserted only state law claims against these individuals.  (Mem. & Order, filed Oct. 5, 2007 ["Oct. 5 Order"].)  Plaintiffs contend they are entitled to restitution of the monies they paid for Walker's medical expenses because said payments were made as a result of the fraudulent and wrongful acts of Sierra and Walker.  Defendants oppose the motion, arguing that triable issues of fact remain as to whether they made any misrepresentation of fact or intended to wrongfully obtain benefits for an employee they knew was ineligible under the subject policy.

For the reasons set forth below, the court DENIES plaintiffs' motion for summary judgment.

## BACKGROUND[2]

CREW is a multiple employer welfare arrangement for certain railroad employers which has established an Employee Welfare Benefit Plan (the "Plan") within the meaning of ERISA, 29 U.S.C. § 1001 *et. seq*.  CREW provides health benefits to qualified and

---

[1] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[2] Unless otherwise noted, the following facts are undisputed.  Said facts are derived from defendants' opposition to plaintiffs' statement of uncontested facts in support of the motion for summary judgment.  (Docket #127-3, filed Aug. 7, 2009 [hereinafter referred to as "RUF"].)

2

properly enrolled active employees of participants and is a fiduciary as defined by ERISA. (RUF ¶ 5.) The Plan is administered by MBA, which is also a fiduciary under ERISA. (RUF ¶s 6, 13.)

Sierra is a short line railroad company in California that qualifies to participate in CREW through membership in the Small Railroad Business Owners Association of America. (RUF ¶ 7.) On July 17, 2003, Sierra submitted a Group Benefit Plan Questionaire (the "Questionaire") to MBA for participation in CREW. (RUF ¶ 18.) Magaw, Sierra's Vice President, signed the Questionaire and attached a list of Sierra's fifty employees, thirty-five of which were to be enrolled in CREW. (RUF ¶ 11, 18.) Walker was not disclosed as an employee and coverage was not requested on her behalf by Sierra. (RUF ¶ 29.) In the Questionaire, Sierra represented that during the previous 12 months, none of its employees, seeking coverage, had been hospitalized, had incurred medical claims in excess of $5,000.00 or had any "major conditions," such as cancer, or expected to be hospitalized within the next 12 months. (RUF ¶ 46.)

Under the subject Plan, only "Active Employees" are eligible to participate in the CREW Plan. The CREW Summary Plan Description provides that an eligible employee is one who works normally at least 24 hours per week and is on the regular payroll of the employer for that work or is under a contract or a full-time written appointment with a member employer. (RUF ¶ 15.)

In response to the Questionnaire, CREW began discussions with Sierra, and Sierra was required to submit supplemental lists of employees who were eligible for the Plan. (RUF ¶s 21-22.)

From July through December 2003, Gilles, Sierra's Human Resources Director, submitted lists of employees to CREW for consideration and rating of the Plan. (RUF ¶s 10, 28.) Gilles also submitted information to CREW regarding which employees were covered under Sierra's existing employee benefit plan with Kaiser Permanente, which did not include Walker as of January 1, 2004. (RUF ¶ 29.)

On December 10, 2003, Magaw signed the Participation Application and Agreement (the "Agreement") between Sierra and CREW, and Gilles faxed it to CREW. (RUF ¶ 31.) The Agreement certified that Sierra read and understood that CREW would rely on the information set forth by Sierra as a basis for approval. (RUF ¶s 32-37.) On January 1, 2004, the Plan between CREW and Sierra became effective. (RUF ¶ 38.)

On January 7, 2004, Gilles submitted an Employee Enrollment Form ("Enrollment Form"), signed by Walker, seeking to add Walker as an enrollee in CREW and verifying that all the information contained therein was correct. (RUF ¶ 77.) The Enrollment Form stated that Walker resided at 333 Crescent Drive, Grand Prairie, Texas, and that she was currently "Employed Full Time" as a "Safety Manager" by "Sierra Railroad Company," and that she was hired by Sierra on "12/19/02." With the exception that she resided in Grand Prairie, Texas, plaintiffs contend none of these statements were true. (RUF ¶ 78.) Plaintiffs assert Walker was not then, and never had been, employed by Sierra: she had been a part time, independent contractor for Yolo Shortline from 2002 through May 2003; she was on active duty in the Army reserves in May 2003; she was not employed by any entity from June through December 2003; and she was not a "full time employee" of any

4

Sierra-related entity in 2004, having only worked a total of 45 hours for entities affiliated with Midland Railroad Enterprises from January 19, 2004 through July 2004. (RUF ¶ 67, 79.)

Defendants dispute plaintiffs' contentions, asserting that Sierra recruited Walker in late-2003 to work for Sierra and its related companies as their safety manager, and that Walker moved to California for this express purpose. (RUF ¶s 16, 78-79.) Defendants maintain that at the time they sought to enroll Walker in the CREW Plan, both Sierra and Walker anticipated that Walker would be a "full-time" employee as defined by the Summary Plan Description; namely, she would "normally" work 24 hours or more per week. (RUF ¶ 61.) Defendants also state that each of the above referenced companies was either merged with or a wholly owned subsidiary of Sierra. Over the years, Walker performed services for each company, including Sierra. (RUF ¶s 55-60, 65.) The services to the various companies were pursuant to a contract with Sierra, and thus, defendants assert Walker was eligible under the terms of the Plan. (RUF ¶s 16, 50.)

On January 7, 2004, Walker told Gilles she had been diagnosed and treated for cancer.[3] Gilles called CREW to ask if pre-existing conditions were covered, but Walker does not recall Gilles telling CREW that Walker had been diagnosed and treated for cancer. (RUF ¶ 71.) Magaw asserts at the time Walker applied for enrollment in the CREW Plan, he did not know she had cancer. (RUF ¶ 70.) Neither Walker nor Gilles disclosed

---

[3] Walker was diagnosed with multiple myeloma, a form of blood cancer, on July 14, 2003, and thereafter actively underwent chemotherapy from July through December 2003, during which time she did not work for any entity. (RUF ¶s 12, 42.)

5

Walker's illness prior to her enrollment in CREW.  (RUF ¶ 94.)

After Walker enrolled in CREW, she, along with healthcare providers, began submitting claims for medical benefits stemming from her treatment of multiple myeloma, with which she had been diagnosed prior to January 7, 2004.  (FAC ¶s 35-36.)[4]

Defendants concede that after January 7, 2004, Walker's work for Sierra was limited due to her illness; however, defendants assert that they intended and anticipated when they re-hired Walker and sought enrollment for her in the CREW Plan, in January 2004, that her normal job duties would qualify her for benefits under the Plan.  (RUF ¶s 64-68.)

On September 8, 2004, Ronald J. Wilson ("Wilson"), the CEO of MBA, asked Gilles and Magaw during a telephone call whether Walker was an employee of Sierra.  Wilson asserts that Magaw responded that Walker was a "contract employee" of Sierra and that Sierra had an agreement to cover her because she was Sierra's Safety Director.  (RUF ¶ 82.)  Magaw denies that he made these statements to Wilson.  (Id.)

Plaintiffs assert that in reliance on the representations by Sierra and Walker, MBA made payments from CREW to healthcare providers on behalf of Walker in the amount of $177,740.35.  (FAC, ¶ 42.)[5]  Plaintiffs maintain that had they not paid Walker's medical expenses, Sierra would have been obligated to

---

[4] Plaintiffs did not describe these facts in their statement of uncontested facts; thus, the court cites the FAC since defendants do not appear to dispute these facts.

[5] Plaintiffs did not describe these facts in their statement of uncontested facts; thus, the court cites the FAC since defendants do not appear to dispute these facts.

pay the expenses pursuant to its agreement to provide such benefits as a term of Walker's employment or pursuant to its employee health benefit program. (RUF ¶s 84-89.) Alternatively, plaintiffs contend Walker was personally obligated to pay her medical expenses. (RUF ¶ 90.) Defendants deny these facts. (RUF ¶s 88-89, 90.)

On November 5, 2004, CREW issued an Adverse Benefit Determination terminating Walker's participation in the CREW Plan based on Sierra's failure to disclose Walker's prior diagnosis and treatment for cancer and Walker's failure to meet the eligibility requirements under the Plan. (RUF ¶ 98.) CREW advised Walker of her right to appeal the decision. However, Walker never appealed the denial of benefits. (RUF ¶ 104.)

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the

7

ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**ANALYSIS**

Plaintiffs assert they are entitled to recover $177,740.35 in health benefits paid by MBA on behalf of CREW for medical treatment to Walker that either Walker, individually, or Sierra, as Walker's employer, would otherwise have been obligated to pay but for Sierra and Walker's misrepresentations and other wrongful misconduct. Plaintiffs claim they are entitled to restitution against Sierra and Walker of said monies pursuant to Section 502(a)(3) of ERISA. 29 U.S.C. § 1132(a)(3).

To sustain a claim under Section 502(a)(3), a plaintiff must establish that (1) it is an ERISA fiduciary and (2) it is seeking

8

equitable relief to redress violations or enforce provisions of the plan. Reynolds Metals Co. v. Ellis, 202 F.3d 1246, 1247 (9th Cir. 2000). Here, defendants do not dispute that CREW and MBA are plan fiduciaries as defined by ERISA. (RUF ¶s 5-6, 13.) Also, this court has previously held that the restitution of monies from defendants that plaintiffs seek is "equitable" relief permitted by Section 502(a)(3). (Oct. 5 Order at 12:6-7, 13:17-20 [rejecting defendants' argument that plaintiffs' ERISA claim was a disguised claim for money damages, as opposed to equitable relief, and holding that "[b]ecause plaintiffs allege facts supporting fraud or wrongdoing and [defendants'] receipt of 'ill-gotten gains,' . . . [their Section 502(a)(3)] is allowable under Ninth Circuit authority"].)

The Ninth Circuit has held that claims for restitution relating to "ill-gotten gains" of a defendant are permissible when a plaintiff alleges fraud. FMC Med. Plan v. Owens, 122 F.3d 1258, 1261 (9th Cir. 1997) (*citing* Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993)) (recognizing that the Supreme Court in Mertens defined "[r]estitution [for purposes of Section 502(a)(3)) as the return of 'ill-gotten' assets or profits taken from a plan"). In Carpenters Health and Welfare Trust for Southern California v. Vonderharr, 384 F.3d 667, 672 (9th Cir. 2004), the court emphasized that "Owens was based on Mertens and did not preclude all claims for [monetary] relief, but appropriately limited restitution and constructive trust remedies to those situations in which fraud or wrongdoing is shown." Further, in Reynolds where the appellant argued that Owens precludes all forms of monetary relief under Section 502(a)(3),

9

the court held: "This badly mischaracterizes the <u>Owens</u> opinion--the opinion accepts, as does <u>Mertens</u>, that restitution and constructive trust remedies may be appropriate under § 1132(a)(3) [ERISA § 502(a)(3)], provided some fraud or wrongdoing is shown." 202 F.3d at 1249.

Thus, the only issue, here, is whether plaintiffs have shown, as a matter of law, that defendants engaged in fraudulent conduct. Defendants contend that to make this showing, plaintiffs must demonstrate each of the elements of a common law fraud claim, namely: (1) a material misrepresentation of fact (or concealment of the same); (3) knowledge of the falsity of the statement; (3) intent to defraud; (4) plaintiffs' justifiable reliance on the misrepresentation; and (5) resulting damage. <u>Anderson v. Deloite & Touche</u>, 56 Cal. App. 4th 1468, 1474 (1997). Plaintiffs argue, to the contrary, that they must show only some "wrongdoing" by defendants. Plaintiffs are incorrect.

First, contrary to plaintiffs' assertions, this court did not so hold in its October 5 Order. There, the court considered whether Count I of plaintiffs' FAC stated an equitable, as opposed to, legal claim for relief; more specifically, whether plaintiffs' claim was truly an equitable claim for restitution or whether plaintiffs actually sought monetary damages. (Oct. 5 Order at 12-13.) In finding plaintiffs' claim viable under ERISA Section 502(a)(3), since it sought equitable restitution of "ill-gotten gains" derived from defendants' alleged fraudulent conduct, the court did not decide what showing plaintiffs would be required to make to establish a fraud. (<u>Id.</u> at 13-14.) The court decides that issue, for the first time, on the instant

10

1  motion.

2      In holding that Section 502(a)(3) does not preclude all
3  forms of monetary relief, the Ninth Circuit has emphasized that
4  such recovery, however, is limited to only those circumstances
5  involving fraudulent conduct by the defendant. Owens, 122 F.3d
6  at 1261; Reynolds, 202 F.3d at 1249; Vonderharr, 384 F.3d at 672.
7  In Mertens, the Supreme Court defined "restitution," permitted by
8  Section 502(a)(2), as the "return of 'ill-gotten' assets or
9  profits taken from a plan." Mertens, 508 U.S. at 260. Applying
10 that definition, the Ninth Circuit determined in Owens and
11 Vonderharr that claims for monetary restitution relating to "ill-
12 gotten gains" of a defendant are permissible when a plaintiff
13 alleges fraudulent conduct. Owens, 122 F.3d at 1261; Vonderharr,
14 384 F.3d at 672. While the Ninth Circuit, in these cases, at
15 times referenced fraudulent and/or "wrongful" conduct, it is
16 clear from the rationale of the cases, that the exception
17 permitting *monetary* recovery is narrow--it is confined to those
18 circumstances wherein a fraud has been perpetrated on the Plan
19 fiduciaries. Id.

20     Indeed, in an analogous case, the Northern District denied
21 the defendant's motion to dismiss, finding that the plaintiffs, a
22 benefit fund and administrator, stated a viable claim under
23 Section 502(a)(3) against an employer to recover amounts paid to
24 an ineligible employee, based on the employer's alleged willful
25 and false reporting of hours worked by the employee. Northern
26 California Food Employers & Retail Clerks Unions Benefit Fund v.
27 Dianda's Italian-American Pastry Co., Inc., 645 F. Supp. 160, 161
28 (N.D. Cal. 1986). The court held that Section 502(a)(3) allows

11

for the redress of plan violations of this sort and that such redress includes compensating the plan for lost monies due to the violation. Id. While the court did not expressly state that the plaintiffs would be required to prove each of the elements of a common law fraud claim to ultimately prevail in the action, the court's emphasis on the alleged *willfulness and falsity* of the employer's conduct supports this court's reading of the requirements of Owens and Vonderharr.

Thus, because the exception permitting monetary recovery under Section 502(a)(3) must be narrowly construed, the court finds, consistent with defendants' argument, that to establish entitlement to the restitution of the alleged "ill-gotten gains" in this case, plaintiffs must establish each of the elements of a common law fraud claim.[6]

However, for several reasons, the court cannot find that plaintiffs have made this showing as a matter of law. Defendants proffer sufficient evidence to raise a triable issue of fact that they did not make any materially false statements of fact and did not intend to defraud plaintiffs in seeking to enroll Walker in the CREW Plan.

As to the alleged misrepresentations of fact, it is undisputed that at the time Sierra filled out the Questionaire, on July 17, 2003, seeking coverage from CREW, Walker was on

---

[6] The court's prior ruling preempting plaintiffs' state law claims under ERISA, including a claim for fraud, does not preclude this holding. (Oct. 5 Order at 7-11.) While plaintiffs may not have a separately viable claim for fraud under state law, fraudulent conduct is required to sustain the instant ERISA claim, and the court properly turns to state law to ascertain the elements of a fraud claim since such a claim is derived from the common law.

12

active duty in the Army, stationed in Texas, and was not an employee of Sierra. (RUF ¶s 11, 12, 18, 29, 42, 94.) Moreover, it is undisputed that at no time, during Sierra's negotiations with CREW from July to December 2003, was Walker an employee of Sierra. (Id.) Accordingly, Sierra had no obligation to disclose Walker as an employee or provide health information pertaining to Walker.[7] Therefore, plaintiffs have not demonstrated any actionable misrepresentation based on Sierra's statements in the Questionaire and during the negotiation period.

As such, plaintiffs' claim of a misrepresentation of fact hinges on Sierra's and Walker's statements in the January 7, 2004 Enrollment Form. The Enrollment Form stated that Walker resided at 333 Crescent Drive, Grand Prairie, Texas; she was currently "Employed Full Time" as a "Safety Manager" by "Sierra Railroad Company;" and she was hired by Sierra on "12/19/02." With the exception that she resided in Grand Prairie, Texas, plaintiffs contend none of these statements were true. (RUF ¶ 78.) Plaintiffs assert Walker was not then, and never had been, employed by Sierra: she had been a part time, independent contractor for Yolo Shortline from 2002 through May 2003; she was on active duty in the Army reserves in May 2003; she was not

---

[7] Indeed, defendants maintain that during this time, Sierra did not know Walker had been diagnosed with cancer. (RUF ¶s 12, 42, 70, 71.) Both Magaw and Gilles testified that they did not know of Walker's diagnosis until January 7, 2004 or thereafter, and Walker testified she did not tell anyone at Sierra about her condition until after she returned to work at Sierra in January 2004. (RUF ¶s 70, 71.) Plaintiffs dispute these facts, arguing that based on Walker's obvious, health condition in late 2003 and early 2004, defendants "had to have known" Walker had cancer. (See Reply, filed Aug. 13, 2009, at 10-11.) However, plaintiffs do not proffer any *evidence* in support of their argument.

13

employed by any entity from June through December 2003; and she was not a "full time employee" of any Sierra-related entity in 2004, having only worked a total of 45 hours for entities affiliated with Midland Railroad Enterprises from January 19, 2004 through July 2004. (RUF ¶ 67, 79.)[8]

Defendants, however, dispute plaintiffs' contentions and proffer evidence that Sierra recruited Walker in late-2003 to work for Sierra and its related companies as their safety manager, and that Walker moved to California for this express purpose. (RUF ¶s 16, 78-79.) Defendants maintain that at the time they sought to enroll Walker in the CREW Plan, both Sierra and Walker anticipated that Walker would be a "full-time" employee as defined by the Summary Plan Description; namely, she would "normally" work 24 hours or more per week. (RUF ¶ 61.) Defendants also submit evidence that each of the above referenced companies was either merged with or a wholly owned subsidiary of Sierra. Over the years, Walker performed services for each company, including Sierra. (RUF ¶s 55-60, 65.) Defendants describe that the services to the various companies were pursuant to a contract with Sierra, and thus, defendants assert Walker was eligible under the terms of the Plan. (RUF ¶s 16, 50.)

Defendants concede that after January 7, 2004, Walker's work for Sierra was limited due to her illness; however, defendants assert that they intended and anticipated when they re-hired

---

[8] At times, plaintiffs make passing reference to alleged misrepresentations in the Enrollment Form regarding Walker's health status. However, with respect to the Enrollment Form, as opposed to the Questionaire, no such claim is viable as the form did not require or ask questions regarding the applicant's health condition. (RUF ¶ 78.)

14

Walker and sought enrollment for her in the CREW Plan, in January 2004, that her regular job duties would qualify her for benefits under the Plan.  (RUF ¶s 64-68.)

Defendants' evidence sufficiently raises a triable issue of fact as to whether defendants made any false statements of fact in the Enrollment Form.  A jury must determine whether the subject statements were materially false.  See In re Lansford, 822 F.2d 902, 904 (9th Cir. 1987) (recognizing that "[w]hether the misrepresentations were material under the circumstances, whether there was reasonable reliance, and whether there was an intent to deceive are [ordinarily] issues of fact" for the jury to resolve).  For example, plaintiffs emphasize that defendants stated in the Enrollment Form that Sierra hired Walker on 12/19/02, suggesting she had been employed by Sierra since that date, when in fact, defendants concede, Walker had periods of time after that date when she was not employed by Sierra; however, a jury must assess whether that statement was *materially* false since defendants only sought coverage for Walker beginning in January *2004*.  Moreover, while plaintiffs contend defendants falsely represented that Walker was a "full-time employee" of Sierra, defendants proffer evidence that at the time Sierra sought benefits for Walker, Sierra had hired Walker to perform work for Sierra under terms which qualified her for the CREW Plan; namely, regular work, as a Safety Manager, of at least 24 hours per week for Sierra and its related companies.  It is for the jury to determine the credibility of defendants' statements regarding Sierra's offer of employment to Walker, Walker's acceptance of the same and defendants' intentions regarding the

15

terms of Walker's employment.  <u>Norwest Mortg. v. Canyon View Estates</u>, Nos. B182090, B183975, 2007 WL 926567, *25 (Cal. Ct. App. April 25, 2007).

For similar reasons, defendants have also raised a triable issue of fact as to whether they intended to defraud plaintiffs, by knowingly seeking coverage for an ineligible employee.  As set forth above, it is undisputed that Walker was not performing any work for Sierra or its related companies at the time Sierra sought coverage from CREW in July to December 2003.  It is also undisputed that Sierra did not know of Walker's health status until January 7, 2004, at the earliest.  Therefore, plaintiffs have not demonstrated defendants' knowledge of any false statements or intent to defraud based on the Questionaire.

With respect to the Enrollment Form, as described above, defendants proffer evidence that it was anticipated both by Sierra and Walker that Walker would work for Sierra and its related companies under terms which qualified her for benefits under the CREW Plan.  Thus, it is a disputed issue of fact whether defendants made any knowingly false statements intending to enroll Walker in a Plan for which she was not qualified. Defendants maintain they believed in January 2004 that Walker met the qualifications for enrollment in the Plan since they hired her to work at least 24 hours per week as the Safety Manager for Sierra and its related companies.  Contrary to plaintiffs' assertions, that Walker ultimately was not able to work those hours does not establish the falsity of defendants' statements, as a matter of law.  It is for the jury to weigh the credibility of defendants' statements and intentions and ascertain whether

16

defendants fraudulently misrepresented Walker's employment status.[9]  See Cummings v. Fire Ins. Exchange, 202 Cal. App. 3d 1407, 1417 (1988) (recognizing that "[g]enerally, issue of whether insured's false statement to insurer during processing of claim was knowingly and intelligently made with knowledge of its falsity, and with intent to defraud insurer, is a question of fact" for the jury).

Thus, plaintiffs have not established, as a matter of law, these additional, requisite elements of a fraud claim. Triable issues of fact remain as to defendants' alleged knowledge of the claimed falsity of their statements in the Enrollment Form and their purported intent to defraud plaintiffs by obtaining coverage for an ineligible employee.[10]

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment as to Count I of the FAC, alleging defendants violated

---

[9] Again, as to the alleged failure to disclose Walker's health status, plaintiffs have not shown that the Enrollment Form required the disclosure of such information. Instead, plaintiffs cite to the Questionaire, and the provisions thereunder, which required defendants to disclose the health status of eligible employees. However, at the time Sierra sought coverage from CREW in July 2003, Walker was not an employee of Sierra or its related companies, and thus, plaintiffs have not demonstrated Sierra had an obligation to disclose Walker's health status. Moreover, it is undisputed that defendants did not know of Walker's health status at that point.

[10] Defendants also argue that plaintiffs' claim fails because they cannot demonstrate Sierra was otherwise obligated to pay Walker's medical bills. Sierra contends that there is nothing in its employment handbook or contract with Walker that obligates it to pay Walker's medical bills. This is not an issue the court can resolve on *plaintiffs'* instant motion; Sierra has not cross-moved for summary judgment, and thus, the court does not resolve this apparent legal issue herein.

17

Section 502(a)(3) of ERISA, is DENIED.

    IT IS SO ORDERED.

DATED: September 1, 2009.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE